UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| DEBRA W. BURNS (FINCH), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:07-CV-182-BG |
| | ) | ECF |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT AND RECOMMENDATION**

Plaintiff Debra W. Burns (Finch) seeks judicial review of a decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The United States District Judge reassigned this case to the United States Magistrate Judge for all proceedings. Burns did not consent to the jurisdiction of the United States Magistrate Judge. Pursuant to the order reassigning this case, the undersigned now files this Report and Recommendation. After reviewing the administrative record and the arguments of both parties, this court recommends that the District Court reverse the Commissioner's decision and remand the case for further administrative proceedings.

**I.    Grounds for Remand**

Burns presents a number of arguments in support of her appeal. She argues in part that (1) the Administrative Law Judge (ALJ) erred in his analysis at the third step of the

sequential disability evaluation; (2) the ALJ's determination regarding her non-compliance with medical treatment is not supported by substantial evidence; and (3) the ALJ failed to follow correct standards in evaluating her credibility. Burns' arguments have merit and require remand.

## II. The ALJ's Step Three Determination

Burns contends her impairments meet or medically equal the criteria of Listing 12.02, Organic Mental Disorders, the listing that addresses psychological and behavioral abnormalities associated with dysfunction of the brain. 20 C.F.R. pt. 404, subpart P, app. 1 § 12.02 (2007). The required level of severity for the listing is met when the threshold requirements of the listing as well as the criteria under either both Subsections A and B or Subsection C are met. The ALJ did not specifically discuss the criteria of Listing 12.02. He summarily noted that the medical expert testified that Burns' mental disorder did not meet the criteria of any listing in the regulations and adopted the medical expert's opinion and incorporated it into his decision. (Tr. 76.)

### A. *Threshold Criteria*

The threshold criteria of Listing 12.02 require a showing that the claimant's medical history and physical examinations or laboratory tests demonstrate the presence of a specific organic factor that has resulted in abnormal mental state and loss of previously acquired functional abilities. § 12.02. The medical expert did not believe the evidence demonstrated the presence of symptoms that would satisfy the threshold criteria of Listing 12.02. She testified that Elizabeth Davidson, M.D., had diagnosed Burns with "some

temporal (INAUDIBLE)." (Tr. 1031.) She testified, however, that the diagnosis had not been a "continuous diagnosis." *Id.* She agreed with Burns' attorney that the medical evidence showed "something in the temporal lobe," but stated that "whether or not that was causing all her psychiatric symptoms or not has never been clarified." (Tr. 1033.) Substantial evidence does not support the medical expert's conclusion. The medical evidence demonstrates that Burns suffered psychiatric abnormalities that were caused by the lesions in her temporal lobe.

Burns' problems began in May 1994. Prior to that time she had not experienced psychiatric abnormalities; she reported that she was well until May 1994 when she began having thoughts of doing things she ordinarily would not do and experienced difficulty concentrating (Tr. 156, 204-05.) Her condition worsened and she experienced short-term memory loss and drove off a road in December 1994. (Tr. 156.) In January 1995 she reported that she had been experiencing "severe" auditory and visual hallucinations for a couple of months and that she had not been coherent at work. (Tr. 156, 201.) These and other problems prevented her from continuing her work as a waitress. (Tr. 118, 526.) Burns' husband and sister reported that Burns' behavior had changed. Burns' husband reported that his wife "seemed very slowed down" in November 1994, and in February 1995 he reported that she initiated conversation less than she had in the past, did not speak unless spoken to, and that she sat and stared at times. (Tr. 204.) Burns' sister reported that she had noticed a change in her sister's personality, and Burns reported being very depressed and "crying for no good reason." (Tr. 156.)

Neurologist K.S. Hawker, M.D., discovered "some small intense lesions in the left temporal lobe" on an MRI. (Tr. 156.) Dr. Hawker referred Burns to Dr. Davidson for evaluation, and Dr. Davidson diagnosed psychotic disorder due to temporal lobe pathology. (Tr. 207.) She noted that Burns exhibited psychomotor retardation, below average intelligence, that she did not speak spontaneously, and that she spoke in a somewhat monotone manner. (Tr. 206.) Dr. Davidson noted that Burns required treatment to alleviate "distressing auditory hallucinations which are due to an organic etiology." (Tr. 207.) Treatment with medication initially resulted in improvement, but Dr. Hawker determined in August 1995 that Burns suffered a "relapse of left temporal lobe syndrome." (Tr. 158.) In Spring 1996 Burns was hospitalized after she overdosed on her prescription medication. (Tr. 224, 376.) Diagnoses from Drs. Hawker and Davidson were unchanged. Dr. Hawker diagnosed temporal lobe syndrome with psychosis (Tr. 172), and Dr. Davidson continued to diagnose psychotic disorder due to temporal lobe pathology, complicated by depression and anxiety. (Tr. 225; *see* Tr. 234-36.) In 1998 Arun Patel, M.D., began treating Burns and diagnosed organic mood disorder. (Tr. 200.) The medical evidence from Drs. Hawker, Davidson, and Patel demonstrates that the threshold criteria of Listing 12.02 are met in this case.

B.  *Subsection A and B Criteria*

The criteria of Subsection A require demonstration of a loss of specific cognitive abilities or affective changes in addition to medically documented persistence of

4

at least one of the following: disorientation to time and place; memory impairment; perceptual or thinking disturbances such as hallucinations or delusions; a change in personality; disturbance of mood; emotional lability such as explosive temper outbursts or sudden crying; or loss of measured intellectual ability. § 12.02(A). The criteria of Subsection B require that the claimant's impairments result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. § 12.02(B).

Burns' symptoms meet the criteria of Subsection A. The evidence demonstrates persistent memory impairment, hallucinations, changes in personality, disturbance of mood, and emotional lability. (*See, e.g.*, Tr. 156, 175, 201, 204, 650, 770, 995.) In regard to Subsection B, the medical expert did not indicate whether she believed Burns had experienced repeated episodes of decompensation. (Tr. 1031.) She testified that Burns experienced only mild restrictions in daily living, moderate difficulties in social functioning; and marked difficulties in maintaining concentration, persistence, or pace. (Tr. 1031.) Evidence from treating sources demonstrate that Burns experienced marked difficulties not only in maintaining concentration, persistence, or pace but in social functioning as well. Notations from intake officers at the Social Security Administration and from Burns' case workers indicate that she did not interact well with others. An intake officer noted that Burns had problems answering questions and that she stared straight ahead during an interview that lasted one hour and fifteen minutes. (Tr. 138.) Another intake

5

officer noted that Burns "sometimes phased out a bit" and would not provide an immediate response to questions and seemed confused by the officer's questions. (Tr. 148.) One of Burns' mental health caseworkers reported that Burns refused to look at her and sat with her back to her during an interview. (Tr. 868.) In addition, Burns' treating neurologist documented social withdrawal, (Tr. 175), and one of her treating psychiatrists noted in July 2004 that Burns was paranoid and was not associating with people. (Tr. 650.) "Marked difficulties" is defined in the regulations as more than moderate but less than extreme. § 12.00(C). The evidence demonstrates that Burns experienced more than moderate difficulties in social functioning.

    C.    *The ALJ's Determination*

The ALJ's determination that Burns did not meet the criteria of a listing, which was based entirely on the testimony of a medical expert, is not supported by substantial evidence. In addition, the ALJ's discussion of the issue was insufficient. The insufficiency of his discussion affected Burns' substantial rights and remand should therefore issue for additional proceedings. *See Audler v. Astrue*, 501 F.3d 446, 448-49 (5th Cir. 2007).

**III**.    **The ALJ's Determination Regarding Non-Compliance with Treatment**

The ALJ noted in his decision that the medical expert believed Burns' mental impairments did not present debilitating symptoms "*while the claimant is taking her medications as prescribed.*" (Tr. 80 (emphasis in the original)). The ALJ also noted that Burns "actually seems to operate in a state of normalcy *so long as she takes her prescribed*

*medication*" and that her mental problems become acute "when she, for whatever reason, decides *sua sponte*, to discontinue her medications." (*Id*. (emphasis in the original)). As the ALJ noted, there is evidence of Burns' non-compliance with recommended treatment in the record, and Burns does not contest this fact. The Commissioner points to this fact and argues that Burns' non-compliance with treatment caused relapses in her condition and that she must therefore bear the responsibility for the relapses. He argues that conditions that can be remedied with treatment are not disabling and that a claimant's failure to comply with prescribed treatment precludes a claimant, who is otherwise disabled, from receiving benefits. Burns, on the other hand, argues that the issue of non-compliance should be further examined on remand. Citing Social Security Ruling 82-59, 1982 WL 31384, as well as district court opinions, she contends the ALJ should have determined whether her failure to comply with prescribed treatment was "justifiable" because of her mental impairments.

Ruling 82-59 directs that individuals with a disabling impairment that is amenable to restorative treatment must follow prescribed treatment in order to be found disabled unless there is a "justifiable" reason for failing to do so. *Id*. at *1. The Ruling directs that a claimant must be informed that failure to follow prescribed treatment may result in a finding of not disabled and that he must be given an opportunity to undergo prescribed treatment or show justifiable cause for failing to do so. *Id*. at *5. The Ruling provides examples of justifiable reasons for a claimant's failure to follow prescribed treatment. Such reasons include situations in which the prescribed treatment is contrary to the teachings and tenets of the claimant's religion; cataract extraction of one eye is prescribed when the loss of vision

in the other eye is severe and cannot be corrected with treatment; the fear of surgery is extreme; the claimant is unable to afford prescribed treatment and free community resources for the treatment are unavailable; and the treatment carries a high degree of risk. *See id.* at *3-4.

There is no evidence in this case to suggest the presence of any of the examples included in Ruling 82-59. However, Ruling 82-59 directs that the examples listed therein are not all-inclusive and that the ALJ must undertake a "full evaluation" in order to determine whether the claimant's reasons for not following prescribed treatment are justifiable. *Id.* at *4. As Burns argues, district courts have held that non-compliance that results from a mental impairment may be a justifiable reason for failing to follow prescribed treatment. *See Brashears v. Apfel*, 73 F. Supp. 2d 648, 651 (W.D. La. 1999) (citations omitted); *see also Grossweiler v. Barnhart*, 2003 WL 22454928 at *2 (W.D.Tex. 2003) (acknowledging that "'federal courts have recognized that a mentally ill person's noncompliance with psychiatric medications could be the result of [the] mental impairment and, therefore, neither willful nor without a justifiable excuse'") (citations omitted).

The holdings in *Brashears* and *Grossweiler* are well reasoned and, based on the facts in this case, should be followed in this case. The plaintiff in *Brashears* suffered from chronic paranoid schizophrenia characterized by paranoid delusions and auditory hallucinations. *Brashears*, 73 F. Supp. 2d at 649. The records established that despite her severe condition, the plaintiff was non-compliant with recommended treatment. She testified that she believed that her medications usually worked but that she sometimes forgot to take them. *Id.* at 649-

50. And she admitted to being non-compliant with medication after she was committed to medical care under a protective custody order; medical personnel noted that she "'still somewhat has her own ideas on how she should take the medication.'" *Id.* at 649-50.(quoting medical personnel). She was subsequently committed to medical care under another protective custody order at a time when she was not taking her medications and refused at that time to take a certain type of medication. *Id.* at 650. As the ALJ in this case, the ALJ in *Brashears* found that the plaintiff experienced exacerbations in her conditions when she was non-complaint with treatment and that she functioned "'quite well'" as long as she took her prescribed medications. *Id.* at 650 (quoting the ALJ); *see* Tr. 80. In *Brashears* the district court agreed with the ALJ that the plaintiff experienced problems when she did not take her medication but also noted that the evidence did not establish the reason for the plaintiff's non-compliance – whether she did not take her medications because of rational choice or mere neglect or whether her failure to do so was caused by the psychotic symptoms of her mental illness. *Id.* at 651. The court concluded that the issue required further examination on remand and instructed the ALJ to consider the plaintiff's limitations, including mental limitations, to determine whether there was an acceptable reason for failure to follow prescribed treatment. *Id.* (citing 20 C.F.R. § 404.1530(c)).

It should be noted that in *Brashears* the plaintiff's psychiatrist and social worker submitted a letter to the Appeals Council indicating that as the plaintiff's psychotic symptoms worsened, she became non-compliant with medication and that such behavior was consistent with her mental illness. *Brashears*, 73 F. Supp. 2d at 651. In this case, Burns'

physicians did not provide an opinion as to the reason Burns was non-compliant with prescribed treatment, and the ALJ did not discern the reasons for Burns' non-compliance. The evidence shows, however, that as the plaintiff in *Brashears,* Burns suffers from a severe mental illness, experiences auditory hallucinations, and has a history of both compliance and non-compliance with recommended treatment. There is also evidence suggesting that symptoms of Burns' mental illness may have caused her non-compliance. In January 2005 Burns told Victor A. Gutierrez, M.D., that she stopped taking Zoloft. (Tr. 633.) She also told him that she had been experiencing auditory and visual hallucinations on a daily basis. *Id*. She complained that the voices in her auditory hallucinations told her bad things that were disturbing to her. In regard to her visual hallucinations, she claimed that in one of the hallucinations, a young girl was seated in front of her and was happy and did not say anything. *Id*. In regard to her decision to stop taking Zoloft, she claimed that she saw on television that the medication caused suicide in teenage girls. Upon further discussion she claimed that she stopped taking the medication "because she felt like she was doing it for the girl or for the man." *Id*. The record also includes notations from a caseworker that Burns lacked understanding of her illness and her medications, (Tr. 614, 925), and a notation indicating that Burns did not believe her medications worked, (Tr. 909). However, it is not clear whether Burns' non-compliance was the result of a rational choice or whether it was caused by the psychotic symptoms of her mental illness. The ALJ should therefore develop the issue further on remand. *See Brashears*, 73 F. Supp. 2d at 651; *Grossweiler*, 2003 WL 22454928, at *4. The ALJ should determine whether Burns' non-compliance with prescribed

medication is a medically determinable symptom of her mental illness; non-compliance that is the result of a mental impairment is not willful or without justifiable excuse. *Brashears,* 73 F. Supp. 2d at 651; *Grossweiler*, 2003 WL 22454928 at *2.

## IV.     The ALJ's Credibility Determination

Social Security Ruling 96-7p and Fifth Circuit precedent direct that the ALJ must indicate the degree to which he finds the claimant's testimony credible and, in cases in which the claimant's testimony is discredited, indicate the basis for that decision. *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988); S.S.R. 96-7p, WL 374186, at *1. The ALJ must give reasons, supported by evidence in the record, that are sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight the adjudicator gave to the claimant's statements and the reasons for that weight. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

The ALJ merely noted in Finding 4 that Burns' "testimony was not considered credible." (Tr. 82.) He did not make clear why he found Burns' testimony not credible. (*See* Tr. 76-81.) In addition, the ALJ failed to consider all the evidence in the record that supported Burns' testimony. Burns reported that symptoms related to her mental illness thwarted her attempts to work. According to Burns, she was unable to continue her job as a waitress, a job she had held for fifteen years, because she began "hearing voices and couldn't get the orders out"; she could not "remember to take the food. People would get upset, the owners let me go until I could get better." (Tr. 118, 822; *See* Tr. 992-93, 1007-08.) She also reported that she later attempted to work at a Dollar General store but voices

bothered her, that her supervisors spoke with her about the problem, and that she did not return to work. (Tr. 822.)

Burns' former employer provided a signed and dated statement that appears in the record as follows:

> Debbie worked as a waitress in my restaurant for about thirteen years. She was a good employee and a willing worker. In 1995 she suddenly began to have mental problems. Her memory was so bad that she could no longer handle that work and I don't think she has been able since then to handle any employment. Following the death of her husband, Bob Burns, Debbie was in financial need. She wanted to work. I have a seven room motel, and the housekeeping is done mainly by me. I let Debbie attempt to do room cleaning work. She was not able to handle this. She could not do laundry alone. She would do such things as put the wrong size sheets on beds. During this time, I would give Debbie small amounts of cash not because of the value of any of the work she was trying to do but because I have the same feelings for her as for family members.

(Tr. 526.) The regulations direct that the ALJ will consider statements regarding the manner in which the claimant's symptoms affect his activities of daily living and ability to work. 20 C.F.R. §§ 404.1529(a), 416.929(a). The statement from Burns' former employer, who had a long-standing relationship with Burns and witnessed the changes in her mental capacity, supports Burns' claims that her mental impairments thwarted her ability to work. The ALJ was bound by the regulations to consider the statement but did not do so. (Tr. 75-83.) On remand the ALJ must consider the statement and other evidence in the record and articulate the reasons for the weight he may assign Burns' statements regarding her impairments.

## V.     **Conclusion and Recommendation**

The court is charged with determining whether the Commissioner's denial of

disability benefits is supported by substantial evidence and whether proper legal standards were used to evaluate the evidence. *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002) (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). The decision in this case was not reached through the correct application of legal standards and is not supported by substantial evidence. The court must set aside findings which are not supported by substantial evidence and must correct errors of law. *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983) (citation omitted).

Based on the foregoing discussion of the issues, evidence and the law, this court recommends that the United States District Court reverse the Commissioner's decision and remand this case for further administrative proceedings.

## VI.   **Right to Object**

Pursuant to 28 U.S.C. § 636(b)(1), any party has the right to serve and file written objections to the Report and Recommendation within ten days after being served with a copy of this document. The filing of objections is necessary to obtain de novo review by the United States District Court. A party's failure to file written objections within ten days shall bar such a party, except upon grounds of plain error, from attacking on appeal the factual

findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

Dated: May 2, 2008.

_____
NANCY M. KOENIG
United States Magistrate Judge